# UNITED STATES DISTRICT COURT

for the

Central District of California

LODGED
CLERK, U.S. DISTRICT COURT
12/13/2024
CENTRAL DISTRICT OF CALIFORNIA
BY: ___AP___ DEPUTY

FILED
CLERK, U.S. DISTRICT COURT
12/13/24
CENTRAL DISTRICT OF CALIFORNIA
BY: ___SL___ DEPUTY

UNITED STATES OF AMERICA,

v.

JESUS MIGUEL AVILA-ORDUNO,

Defendant.

Case No. 5:24-mj-00521

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

Beginning on December 11, 2024, in the county of San Bernardino in the Central District of California, the defendant violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 922(g)(5) | Illegal Alien in Possession of a Firearm |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

/S/
_____
Complainant's signature

Border Patrol Agent, Jorge Palomo
_____
Printed name and title

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: December 13, 2024

_____
Judge's signature

City and state: Riverside, California

Hon. David T. Bristow. U.S. Magistrate Judge
_____
Printed name and title

AUSA: Thomas Magana (213-894-1344)

AUSA: Thomas Magana (213-894-1344)

**AFFIDAVIT**

I, Border Patrol Agent Jorge Palomo, being duly sworn, declare and state as follows:

## I. PURPOSE OF AFFIDAVIT

1. This affidavit is made in support of a criminal complaint against Jesus Miguel AVILA-Orduno (AVILA) for a violation of 18 U.S.C. § 922(g)(5): Illegal Alien in Possession of a Firearm.

2. This affidavit is also made in support of an application for a warrant to search the following digital devices (collectively, the "SUBJECT DEVICES"), in the custody of United States Border Patrol, in Indio, California, as described more fully in Attachment A:

    a. Apple, iPhone, Rose Gold, Clear Case ("SUBJECT DEVICE 1"); and

    b. Apple, iPhone, Navy Blue, No Case ("SUBJECT DEVICE 2").

3. The requested search warrant seeks authorization to seize evidence, fruits, or instrumentalities of violations of 18 U.S.C. § 922(g)(5) (Illegal Alien in Possession of a Firearm) as described more fully in Attachment B. Attachments A and B are incorporated herein by reference.

4. The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and

search warrant and does not purport to set forth all of my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II. BACKGROUND OF AFFIANT

5. I am a United States Border Patrol Agent ("BPA") with the Department of Homeland Security, Customs and Border Protection, United States Border Patrol ("USBP"). I have been employed as a full-time, sworn federal BPA with the USBP since September 03, 2009, and graduated from the USBP Basic Border Patrol Training Academy located in Artesia, New Mexico. The 23-week Academy curriculum covers specialized training in the Immigration and Naturalization Act, criminal law, and statutory authority, as well as cross-training in Title 21, United States Code, Controlled Substances law, and in Title 19, United States Code, Customs law.

## III. SUMMARY OF PROBABLE CAUSE

6. AVILA was driving on the I-40 freeway and was stopped by USBP agents, who ultimately determined that AVILA was unlawfully in the United States. Agents recovered a Palmetto State Armory, model PA15, multi caliber firearm and a magazine with 30 rounds of ammunition in AVILA's vehicle. Agents also recovered the SUBJECT DEVICES from AVILA's vehicle.

## IV. STATEMENT OF PROBABLE CAUSE

7. Based on my review of law enforcement reports, conversations with other law enforcement agents, and my own knowledge of the investigation, I am aware of the following:

**A.  Traffic Stop of AVILA**

8. On December 11, 2024, at approximately 10:40 a.m., Border Patrol Agents from Indio Station assigned to the Disrupt Team were working on Interstate 40 (I-40) near Barstow, California. Indio Disrupt agents were driving marked and unmarked Border Patrol service vehicles equipped with emergency lights and sirens. BPAs Walla and Raymer were riding together and positioned their unmarked service vehicle in the median of I-40 near the Newberry Springs exit observing westbound traffic. Although unmarked, their vehicle has many features reflecting that it is a law enforcement vehicle; radio antennae are visible, and in the rear window, and front window, emergency lights are visible. In my training and experience, vehicles that appear to spot such USBP vehicles usually slow down briefly, then speed back up.

9. The agents observed a silver Dodge Ram (the "Ram") approaching their location traveling in the fast lane of the two-way divided highway. As the Ram passed their location, they observed it change lanes over to the slow lane of traffic. There were no vehicles close by in front of or behind the Ram. BPA Raymer has observed this driving behavior from prior smuggling cases where vehicles involved in criminal activity will make abrupt and unnecessary lane changes. BPA Walla and BPA Raymer

3

merged onto westbound I-40 to further observe the Ram. When the Ram passed the agents, it had been traveling at a speed consistent with the general flow of traffic, but when BPA Walla and BPA Raymer caught up to it, it had drastically slowed in speed and was traveling behind a slow-moving semi-truck. In their experience, BPA Walla and Raymer have learned and observed that vehicles involved in smuggling activity will use this driving tactic with the hope that law enforcement will pass them on the freeway. BPA Raymer used his government issued laptop and queried the Ram's Arizona license plate. The plate came back registered to "Jesus M Avila Orduno," with a place of birth in the city of Mesa, Arizona. BPA Raymer queried AVILA using Department of Homeland Security database systems, which showed AVILA to be a citizen and national of Mexico. DHS records showed that AVILA had been issued a B1/B2 Visa on August 19, 2008, and had overstayed his visit. The visa was revoked in 2012. BPA Raymer was able to obtain an image of AVILA from using law enforcement database systems.

    10.  BPAs Walla and Raymer pulled alongside the Ram and observed a male driver that matched the image of AVILA that they had obtained from their review of law enforcement databases. According to BPA Raymer, the driver stared straight forward and would not look over at the agents' vehicle. BPA Walla and BPA Raymer positioned their vehicle behind the Ram and observed it swerve over the solid white fog line numerous times. In their experience, BPAs Walla and Raymer have learned that drivers involved in illicit activity will often swerve over the center

4

and fog lines because they are distracted looking in their mirrors at law enforcement instead of focusing on the road ahead of them.

11. Based on the driver matching the description of the photograph obtained from law enforcement database systems, the behavior of the driver, and the driving behavior, BPAs Walla and Raymer performed a vehicle stop on the Ram. The Ram pulled over on westbound I-40 at the Hidden Springs off-ramp. Additional BPAs arrived on scene to assist with the vehicle stop.

12. BPA Raymer approached the Ram from the passenger side and identified himself as a Border Patrol Agent to the driver, later confirmed as AVILA. BPA Raymer asked AVILA if he had any identification. AVILA presented a Mexican Sonoran driver's license. The name and picture identification matched the record checks that BPA Raymer queried on his government issued laptop. AVILA stated he was a citizen and national of Mexico. AVILA stated that his Visa had been revoked and he had returned to Mexico in 2012. AVILA admitted to illegally entering the United States from Mexico approximately six years ago. AVILA admitted to being illegally present in the United States.

13. BPA Raymer asked AVILA if there were any weapons in the vehicle. AVILA stated that he had a rifle in the backseat. Due to AVILA being illegally present in the United States, and being in possession of a firearm, he was placed under arrest and put in the backseat of BPA Perez's and BPA Herrera's service vehicle.

14. A search of the Ram revealed what appeared to be an AR-15 firearm that was from Palmetto State Armory with serial number DCSF601055. El Centro Sector radio dispatch ran the serial number and stated that it was not stolen and had no record on file. A further search of the Ram revealed one magazine with thirty rounds of .223 caliber ammunition. AVILA, the Ram, rifle, and ammunition were transported to a safer location off the freeway for further investigation.

15. Agents then discovered a bolt cutter and a Sawzall saw in the backseat of the Ram. AVILA told agents that he worked in construction doing drywall work. BPA Perez told AVILA that a bolt cutter and a Sawzall were not needed for drywall work. BPA Perez asked AVILA if he used the tools to break into railroad trains. AVILA admitted to being part of a group that targets Union Pacific trains, breaking into the containers.

16. During a search incident to arrest of AVILA, SUBJECT DEVICE 1 was found on AVILA's person, and SUBJECT DEVICE 2 was found on the front passenger seat of the Ram. AVILA claimed ownership of SUBJECT DEVICES 1 and 2.

    **B.    AVILA's Statements**

17. On December 11, 2024, at 2:34 p.m., at the Indio Border Patrol Station in Indio, California, AVILA was advised of his *Miranda* rights in Spanish. AVILA stated that he understood his rights and was willing to answer questions without the presence of an attorney. The interview was recorded. In the interview, AVILA stated, among other things:

a. AVILA was from Caborca, Sonora, Mexico, and he last entered the United States by walking through the desert near Sonoita, Arizona, approximately six years ago.

b. AVILA admitted that he does not possess legal documents to be in or enter the United States legally.

c. AVILA claimed that he paid $5,000 (U.S.) to be smuggled into the United States.

d. AVILA claimed he has resided in Los Angeles, California, Salt Lake City, Utah, Kona, Hawaii, Phoenix Arizona, and Tampa Bay, Florida while working for a construction company remodeling Hotels for Genisis Construction.

e. AVILA claimed he currently resides in Mesa, Arizona and has a daughter that currently resides in Mexico.

f. AVILA stated that he is currently unemployed but is working with a group of men that rob freight trains. AVILA claimed this was going to be his second attempt to rob freight trains. AVILA met this group of men from friends and acquaintances and said they learn about the train schedules and routes via live feed on You Tube.

g. AVILA claimed he was looking for some partners to rob a train when he was encountered by agents that day.

h. AVILA was asked how he obtained the firearm he had in his possession when he was arrested. He said he obtained the firearm from an acquaintance who was going back to Mexico and was selling the firearm. AVILA said he likes weapons, and he likes to go target shooting, so he bought the firearm for $800. He said he was not carrying the firearm for protection.

7

    i. AVILA said that his friend who sold him the firearm was also a Mexican citizen illegally present in the U.S. AVILA admitted that he knew it was illegal for him to possess a firearm and said that he picked up the firearm approximately four days earlier near Needles, California.

    j. AVILA said that the tools that were found in his vehicle were for cutting locks on freight trains. He also said that the subjects he works with robbing trains are also illegally present in the U.S.

    k. AVILA claimed that the two iPhones found in his possession (SUBJECT DEVICES 1 and 2) were his but one of them is not in service.[1]

  **C.** **Interstate Nexus**

  18. On December 13, 2024, ATF SA Paul Kirwan, who is trained in the interstate nexus of firearms, examined a photograph of the firearm recovered from AVILA's vehicle, described above, and SA Kirwan determined that the firearm was manufactured outside California. Because the firearm was recovered in California, it must have been transported in interstate commerce.

  **V.** **TRAINING AND EXPERIENCE ON FIREARMS OFFENSES**

  19. From my training, personal experience, and the collective experiences related to me by other law enforcement officers who conduct who conduct firearms investigations, I am aware of the following:

---

[1] A third phone was recovered from the Ram, but AVILA said it belonged to another person who had left it in AVILA's vehicle.

a. Persons who possess, purchase, or sell firearms generally maintain records of their firearm transactions as items of value and usually keep them in their residence, or in places that are readily accessible, and under their physical control, such in their digital devices. It has been my experience that prohibited individuals who own firearms illegally will keep the contact information of the individual who is supplying firearms to prohibited individuals or other individuals involved in criminal activities for future purchases or referrals. Such information is also kept on digital devices.

b. Many people also keep mementos of their firearms, including digital photographs or recordings of themselves possessing or using firearms on their digital devices. These photographs and recordings are often shared via social media, text messages, and over text messaging applications.

c. Those who illegally possess firearms often sell their firearms and purchase firearms. Correspondence between persons buying and selling firearms often occurs over phone calls, e-mail, text message, and social media message to and from smartphones, laptops, or other digital devices. This includes sending photos of the firearm between the seller and the buyer, as well as negotiation of price. In my experience, individuals who engage in street sales of firearms frequently use phone calls, e-mail, and text messages to communicate with each other regarding firearms that the sell or offer for sale. In addition, it is common for individuals engaging in the unlawful sale of firearms to have photographs of firearms they

9

or other individuals working with them possess on their cellular phones and other digital devices as they frequently send these photos to each other to boast of their firearms possession and/or to facilitate sales or transfers of firearms.

        d.    Individuals engaged in the illegal purchase or sale of firearms and other contraband often use multiple digital devices.

## VI. TRAINING AND EXPERIENCE ON DIGITAL DEVICES

    20.    As used herein, the term "digital device" includes the SUBJECT DEVICES.

    21.    Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

        a.    Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet. Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time. Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

        b.    Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of

evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device. That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them. For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

      c.   The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it. For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

      d.   Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

22. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data

11

during a search of the premises for a number of reasons, including the following:

    a.   Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.

    a.   Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

23.  Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## VII. CONCLUSION

24.  For all of the reasons described above, there is probable cause to believe that AVILA has committed a violation of 18 U.S.C. § 922(g)(5): Illegal Alien in Possession of a Firearm.  There is also probable cause that the items to be

///
///
///

seized described in Attachment B will be found in a search of the SUBJECT DEVICES described in Attachment A.

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone on this 13th day of December 2024.

_____
HON. DAVID T. BRISTOW
UNITED STATES MAGISTRATE JUDGE

13